**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| Carthage Specialty Paperboard, Inc., *et al.*,[1] | )  Chapter 11 |
| | )  Case No. 18-30226 (MCR) |
| | ) |
| | )  Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |

## DECLARATION OF DONALD SCHNACKEL
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, DONALD SCHNACKEL, hereby declares and says as follows:

1.     I am the Vice President of Finance of Carthage Specialty Paperboard, Inc. ("CSP", or the "Company") one of the above-captioned debtors and debtors in possession (collectively the "Debtors"). In such capacity, I am familiar with the Debtors, their businesses, operations and financial affairs and I am qualified to make this declaration (this "Declaration") on behalf of the Debtors.

2.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court"), commencing the Debtors' chapter 11 cases (these "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Carthage Specialty Paperboard, Inc. (7076) and Carthage Acquisition, LLC (6503).

trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Declaration, no official committees have been appointed or designated.

3.      Contemporaneously herewith, the Debtors have filed or soon will file the motions and applications described below (collectively, the "First Day Pleadings").[2] I have reviewed and am familiar with the contents of each of the First Day Pleadings (including the exhibits and schedules thereto) and I believe that the relief requested therein is necessary to minimize disruption to the Debtors' business, to enable a smooth and effective transition into chapter 11, to preserve and maximize the value of the Debtors' estates, and, ultimately, to enable a successful result in these Chapter 11 Cases. I also believe that the Debtors and their estates would suffer immediate and irreparable harm in the event the Debtors are not able to use cash collateral to make certain essential payments and otherwise continue conducting ordinary course business operations as sought and described in greater detail in the First Day Pleadings.

4.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' businesses and operations, my review of relevant documents, information provided to me or verified by other executives or employees or consultants to the Debtors, and my personal opinion based upon my experience, knowledge and information concerning the Debtors and the industry in which they operate. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I would competently testify to the facts set forth herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Pleadings.

3110409.2

**Background**

5.      Debtor Carthage Acquisition, LLC ("Parent") is a Delaware limited liability company whose primary asset is comprised of all of the issued and outstanding capital stock of CSP.

6.      CSP is a New York corporation engaged in the manufacture and sale of paperboard products for a wide variety of industries and applications. The Company employs 78 full-time employees and one part-time employee at its paper mill located in Carthage, New York. Approximately three-quarters of the Company's personnel are employed on an hourly basis and are represented by the local chapter of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union (the "Union"). The Company enjoys a good working relationship with Union leaders and recently renegotiated its collective bargaining agreement which is currently in effect through June 30, 2022.

7.      The Company's paperboard products are used in premium specialty packaging and graphics arts applications to make folding cartons, boxes, book covers, matboard (for custom framing and other applications) and displays, bottlecap seals for the pharmaceutical and food packaging industries, and many other paper-based products. The Company has a broad array of "off the shelf" offerings, many of which meet FDA requirements for food grade use, and can also accommodate custom specifications, including requirements as anti-tarnish, hard sizing, custom colors, Dairyman Standard (microbiological) and many others.

8.      The Company's facility is located alongside the banks of the Black River, and includes a small hydro-electric facility that provides clean, renewable power sufficient to meet approximately 20% of the company's electricity needs. The Company manufactures the vast

3

3110409.2

majority of its products (approximately 96%) using 100% recycled fiber and employs other environmentally friendly practices such as the utilization of hydro-electric and cogeneration technology. CSP estimates that its commitment to the use of recycled raw materials saves over 300 million gallons of water and more than 4 million cubic feet of landfill space on an annualized basis, while at the same time resulting in an emissions savings equivalent to over 45,000 metric tons of carbon.

9.     The Company has made a number of investments in its facility in recent years, including installing an upgraded heat recovery process in 2009, a new distributed control system in 2012, and a major rebuild and expansion to its paper machine in 2014.

10.     Unfortunately, the Company has struggled financially in recent years due to a number of factors. The 2014 paper machine rebuild, which was completed at a cost of approximately $3.3 million, was expected to increase production capacity by approximately 23% while at the same time allowing for quality improvements that would enable the Company to produce higher margin products resulting in a projected 50% increase in overall sales revenue. However, the Company has been unable to realize the benefit of this significant upgrade due to unforeseen engineering challenges and missteps in installation which significantly delayed the Company's ability to take advantage of the anticipated production volume and quality improvements. Although the quality control issues associated with the paper machine rebuild have now been largely corrected, until recently these problems relegated the Company to producing lower grade (and lower margin) products and also resulted in some customer loss for higher grade (and higher margin) products. In approximately April, 2016, the Company encountered another setback when one of its oldest and largest customers that historically purchased a significant volume of high margin goods and accounted for approximately 10% of

4

the Company's annual revenue went out of business as a result of its own financial difficulties.
Profitability has been further suppressed in recent years as the Company has experienced an
increase in the cost of fiber and other raw materials, as well as in direct operational costs. As a
result of these and other factors, the Company has experienced a significant decrease in its
operating income and has struggled to meet its debt service obligations.

11.    In a proactive response to the financial difficulty the Company was experiencing,
between July and October 2017, the Company sought and obtained nearly $2 million in
additional financing from its secured lenders which the parties anticipated would provide the
necessary cash to allow the Company to continue operations through the first quarter of 2018 as
it pursued a possible sale or other liquidity event. The Company also engaged Daniel Zwelling
of Rivermill Advisors, LLC (Mr. Zwelling conducts all investment banking related business,
including this engagement, through Bradley Woods & Co. Ltd., member, FINRA and SIPC)
("Rivermill") as an investment banker to assist the Company in pursuing a recapitalization or a
sale of its operations.

12.    With the assistance of Rivermill, the Company embarked on an intensive
campaign to pursue additional equity financing, including identifying and soliciting interest from
a number of potential purchasers regarding a sale of the Company or some or all of its assets. In
total, and with Rivermill's guidance, the Company identified and contacted approximately 46
parties that were likely to have an interest acquiring a stake in the Company or in some of its
assets. The Company entered into approximately 27 confidentiality and non-disclosure
agreements with prospective purchasers and financiers to enable those interested parties to
conduct diligence and evaluate the Company. Initially, the Company's marketing efforts were
successful and the Company engaged in productive negotiations with several prospective

5

purchasers. In late January 2018, the Company elected to move forward with an offer from a bona fide purchaser to acquire substantially all of the Company's assets on terms and conditions that the Company believed would be acceptable to its secured lenders.

13.    On or about January 30, 2018, as the Company and the prospective purchaser were negotiating the terms of a letter of intent, the Company first learned that, on January 8, 2018, the Pension Benefit Guaranty Corporation ("PBGC") had, unbeknownst to the Company, filed two notices of lien asserting that the Company was liable for certain pension plan funding obligations in the amounts of approximately $4.0 million and $2.6 million respectively (the "PBGC Liens"). The Company believes that the PBGC Liens relate to two pension plans sponsored by a former affiliate of the Company, but for which the Company has little, if any funding liability.[3] Accordingly, the filing of the PBGC Liens was an unexpected event for the Company.

14.    Shortly after learning of the recently filed PBGC Liens, on or about February 7, 2018, the prospective purchaser with whom the Company had been negotiating withdrew its offer, citing uncertainty about the Company's ability to convey clear title to its assets. The Company, through Rivermill, immediately contacted several of the other parties who had expressed an interest in acquiring the Company, however, no credible purchaser was willing to enter into a transaction unless the Company could guarantee that the sale would be free and clear of any asserted liens by the PBGC. Compounding the difficulties facing the Company, once its lenders became aware of the asserted PBGC Liens, they were no longer willing to advance any additional funds to the Company in light of the priming nature of PBGC's statutory lien, if valid.

---

[3]  The Company believes that the PBGC is asserting liability based on a "controled group" theory, however, the Company does not believe there is any valid basis for it to be included in the controled group of the plan sponsor. Moreover, neither the Company, nor its current or former employees participated in one of the plans for which the PBGC asserts a lien. With respect to the other plan, for which the PBGC asserts a $2.6 million lien, the Company believes that its liability, if any at all, is a mere fraction of the total asserted by the PBGC.

3110409.2

15.    Accordingly, in the span of approximately a week, the Company went from steadily progressing toward a successful sale transaction to finding itself without access to needed liquidity and facing an unexpected and acute cash flow shortage as a result of its debt service obligations, reduced revenue and inability to access additional financing.  These Chapter 11 Cases were commenced in order to address this unexpected funding crisis, to take advantage of the "breathing spell" afforded by section 362 of the Bankruptcy Code, and to resume the Company's efforts to sell all or substantially all of its assets via a sale free and clear of existing liens pursuant to section 363 of the Bankruptcy Code to a qualified buyer who can, hopefully, continue the Debtors' business and operations, thereby preserving going-concern value and many jobs.

16.    Due to the timing and nature of the events leading to the filing of these Chapter 11 Cases, the Company was not able to secure a committed stalking horse purchaser prior to the Petition Date.  Nevertheless, the Company is hopeful that one or more of the potential purchasers who previously expressed an interest in the Company's assets will reengage and agree to serve as a stalking horse now that the Company can offer the protections afforded by section 363(f) of the Bankruptcy Code.  In the event that a third party stalking horse purchaser cannot be identified, the Company's management team has articulated a willingness to put together a buyout package that could serve as the basis for higher and better bids at auction, and has engaged in substantial discussions with the Company's lenders in that regard.

17.    As of the Petition Date, the Debtors had combined estimated assets of approximately $14 million (based on book value) and estimated liabilities of approximately $31 million, not including the amounts asserted to be owed by the PBGC.

3110409.2

18.    The Debtors are indebted to secured creditors KeyBank National Association

("KeyBank"), Patriot Capital III SBIC, L.P. ("Patriot SBIC"), Patriot Capital III, L.P. ("Patriot

Capital"), Pine Street Capital Partners II, LP ("Pine Street"), Hudson River Co-Investment Fund

II, LP ("Hudson River"), North Country Co-Investment, LLC ("North Country"), Donald H.

Schnackel ("Schnackel"), and Development Authority of the North Country ("DANC")

(collectively, the "Prepetition Secured Creditors"), pursuant to the following transactions and

documents:

(i)     On July 11, 2014, CSP executed and delivered a Credit and Security
        Agreement (together with all amendments, forbearance agreements and
        related transaction documents, including, without limitation, the
        documents identified on Schedule A to the proposed Emergency Order,
        the "KeyBank Credit Facility"), pursuant to which KeyBank made
        available to CSP a revolving line of credit in an amount not to exceed $2.5
        million and extended a term loan in the original principal amount of $12
        million. On or about October 4, 2017, KeyBank extended an additional
        $640,000 on a term loan basis to CSP under the KeyBank Credit Facility.
        Repayment of the amounts loaned under the KeyBank Credit Facility is
        secured by a first position security interest and lien upon substantially all
        of the Debtors' assets (the "Prepetition Collateral") and was guaranteed by
        Parent, among other entities. As of the Petition Date, the Debtors estimate
        that their aggregate principal obligations to KeyBank under the KeyBank
        Credit Facility total approximately $10,127,908.42.

(ii)    On July 11, 2014, the Debtors executed and delivered a Securities
        Purchase Agreement (together with all amendments, forbearance
        agreements and related transaction documents, the "2014 Sub Debt
        Facility"), pursuant to which Patriot SIBC, Patriot Capital and Pine Street
        (collectively, the "2014 Sub Debt Lenders") provided an aggregate of $7
        million in financing to the Debtors in exchange for promissory notes and
        warrants issued by the Debtors. Repayment of the amounts loaned under
        the 2014 Sub Debt Facility is subject to a priority waterfall as set forth in
        the 2014 Sub Debt Facility documents, and is secured by a security
        interest and lien on substantially all of the Debtors' assets, and is
        subordinated to the KeyBank Credit Facility pursuant to the terms of an
        intercreditor agreement between the 2014 Sub-Debt Lenders and
        KeyBank.[4]    As of the Petition Date, the Debtors estimate that their

---

[4] The intercreditor agreement between KeyBank and the 2014 Sub Debt Lenders specifically provides that KeyBank may consent to the use of Cash Collateral in its sole discretion and that all liens granted to KeyBank shall be superior in priority to the liens and security interests of the 2014 Sub Debt Lenders.

aggregate obligations to the 2014 Sub Debt Lenders under the 2014 Sub Debt Facility total approximately $8,633,793.96.

(iii)    On July 11 2017, the Debtors executed and delivered a Securities Purchase Agreement (together with all amendments, forbearance agreements and related transaction documents, the "2017 Sub Debt Facility"), pursuant to which North Country, Huston River, Schnackel, Patriot SIBC, Patriot Capital and Pine Street (collectively, the "2017 Sub Debt Lenders") provided an aggregate of $955,000 in financing to the Debtors in exchange for promissory notes and warrants issued by the Debtors. On or about October 4, 2017, the 2017 Sub Debt Lenders extended an additional $250,000 to the Debtors under the 2017 Sub Debt Facility. Repayment of the amounts loaned under the 2017 Sub Debt Facility is subject to a priority waterfall as set forth in the 2017 Sub Debt Facility documents, and is secured by a security interest and lien on substantially all of the Debtors' personal property, and is subordinated to the KeyBank Credit Facility pursuant to the terms of subordination agreement between the 2017 Sub Debt Lenders and KeyBank. As of the Petition Date, the Debtors estimate that their aggregate obligations to the 2017 Sub Debt Lenders under the 2017 Sub Debt Facility total approximately 1,296,799.97.

(iv)    On September 4, 2014, the Debtors executed and delivered a Commercial Loan Agreement (together with all amendments and related documents, the "DANC Facility"), pursuant to which DANC provided the Debtors with a $1 million loan. Repayment of the DANC Facility is secured by a security interest and lien upon substantially all of CSP's assets, guaranteed by Parent, and is subordinated to the KeyBank Credit Facility, the 2014 Sub Debt Facility and the 2017 Sub Debt Facility pursuant to subordination agreements with KeyBank and the 2014 Sub Debt Lenders and 2017 Sub Debt Lenders. As of the Petition Date, the Debtors estimate that their aggregate obligations to DANC under the DANC Facility total approximately $1,029,783.86.

(v)    On January 8, 2018, the the Pension Benefit Guaranty Corporation ("PBGC") filed two notices of lien asserting that the Company was liable for certain pension plan funding obligations in the amounts of approximately $4.0 million and $2.6 million respectively.[5]

---

[5] The Company believes that its liability to the PBGC, if any at all, is a mere fraction of the amount asserted in the notices of lien. The Company also believes that any lien the PBGC may have is junior in priority to all other Prepetition Secured Creditors so as to render the value of such lien, if valid, effectively zero. Nevertheless, to the extent the PBGC may have a valid lien, it is included for purposes of the Debtors' Cash Collateral Motion as a Prepetition Secured Creditor.

3110409.2

19.     In addition to the foregoing, as of the Petition Date, CSP owed approximately $4 million on an unsecured basis to trade creditors.

20.     Due in part to the extenuating circumstances leading to the accelerated filing of these Chapter 11 Cases, the Debtors have not had an opportunity to secure a commitment for debtor in possession financing, although discussions regarding a potential postpetition financing facility are ongoing.  As discussed more fully below and in the Debtors' cash collateral motion however, KeyBank has consented to the Debtors' use of cash collateral, subject to certain agreed upon terms and conditions.  KeyBank has also agreed that proceeds from the anticipated sale of certain non-core assets (separate and apart from the main sale of substantially all of the Company's assets and business) may be used to fund administrative costs of these Chapter 11 Cases.

21.     Although the Debtors believe that KeyBank is possibly undersecured, the Debtors have also made an attempt to contact each of the other parties who the Debtors believe may assert a collateral interest or lien on the Debtors' cash, including the 2014 Sub Debt Lenders, the 2017 Sub Debt Lenders, DANC and the PBGC to inform them of the Debtors' need to utilize cash collateral and proposed adequate protection package.

22.     The Company also has approximately $2.4 million on deposit with the New York State Workers' Compensation Board (the "WCB"), a portion of which should be available to support the Company during these Chapter 11 Cases.  The monies were deposited for the purpose of funding the Company's residual workers' compensation liabilities relating to the period prior to March 2014 when the Company was self-insured for workers' compensation

3110409.2

claims, which claims are now being administered by the WCB.[6]  According to the Company's records and claim projections, the total expected liability for the 19 open claims relating to the pre-March 2014 period will not exceed approximately $1.1 million.  In late 2017, the Company, through counsel, requested that the WCB reduce the amount of funds on deposit and release to the Company that portion which is in excess of the estimated value of remaining claims.  On February 14, 2018, the WCB informed the Company that it was not willing to reduce the deposit. The Company believes that the money on deposit with the WCB represents property of the Company's bankruptcy estate, and that any amounts in excess of the actuarial claims projection should be turned over by the WCB to the Company in accordance with the requirements of section 542 of the Bankruptcy Code.  In the event the WCB neglects or refuses to comply with the turnover provisions of the Bankruptcy Code, the Company may seek an order from the Court compelling the WCB to return the funds to the Company.

23.    The Company also expects to build its available cash position in the short term through a temporary reduction in expenses and collection of existing accounts receivable over the course of the next few weeks.  The Company's paper mill typically runs around the clock, twenty-four hours a day, seven days a week, utilizing four shifts of workers to maximize output. Occasionally, however, production will be temporarily halted for a brief period in order to perform maintenance services or to transition to a different type of product.  The Company implemented such a temporary suspension on February 25, 2018 in order to correct some electrical and safety-related issues.  In addition to addressing these issues, this brief hiatus will allow the Company to conserve resources until suitable arrangements for debtor in possession financing can be put into place.  Due to the uncertainty surrounding the availability of

---

[6] Since March 2014 the Company has had traditional workers' compensation coverage in place through an insurance carrier.

3110409.2

postpetition financing however, in an abundance of caution and based on the advice of counsel, on February 28, 2018 and prior to filing its chapter 11 petition, the Company provided its employees with notices required under the New York State Worker Adjustment and Retraining Notification (WARN) Act, advising them that, if the Company's sale efforts are ultimately unsuccessful, their employment would be terminated.    The Company is, however doing everything in its power to avoid such a situation and to ensure a successful sale through these Chapter 11 Cases.

## FIRST DAY PLEADINGS

**A.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES (the "Joint Administration Motion")**

24.    The Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases, for procedural purposes only, pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, request that an official caption be used by all parties in all pleadings in the jointly administered cases, and that a docket entry be entered on the docket of each case to reflect the joint administration.

25.    The joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Chapter 11 Cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.    The Debtors anticipate that numerous notices, applications, motions, and other pleadings, hearings and orders in these cases will affect both of the Debtors.

26.    Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to:  (a) use a single caption on all documents that will be served and filed in the Debtors' Chapter 11 Cases; and (b) file pleadings

12

3110409.2

in one case rather than in multiple cases. Joint administration will also protect parties in interest

by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of

the various matters before the Court in these cases. Joint administration of these Chapter 11

Cases will ease the administrative burden for the Court and all parties in interest.

27. The rights of the respective creditors of each of the Debtors will not be adversely

affected by joint administration of these cases because the relief sought in this Motion is purely

procedural and is in no way intended to affect substantive rights. Each creditor and other party

in interest will maintain whatever rights it has against the particular estate in which it allegedly

has a claim or interest.

28. Accordingly, by the Joint Administration Motion, the Debtors request that the

Court direct the joint administration of the Debtors' Chapter 11 Cases.

**B.     MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER: (A) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL ON AN EMERGENCY BASIS, (B) GRANTING ADEQUATE PROTECTION PURSUANT TO SECTIONS 105, 361 AND 363 OF THE BANKRUPTCY CODE, AND (C) SCHEDULING INTERIM AND FINAL HEARINGS FOR APPROVAL OF THE DEBTORS' CONTINUED USE OF CASH COLLATERAL (the "Cash Collateral Motion")**

29. As set forth above, the Prepetition Secured Creditors (who are collectively owed

in excess of $21 million) have security interests and liens covering all or substantially all of the

Debtors' property, including the Debtors' cash (the "Cash Collateral").[7]

30. The Debtors request that the Court grant the following relief as provided in the

proposed order submitted with the Cash Collateral Motion:

---

[7] The Debtors anticipate that the Pension Benefit Guaranty Corporation ("PBGC") may assert a lien on the Debtors' assets, including their cash, pursuant to notices of lien filed on January 8, 2018. The Debtors believe that their actual liability, if any, is significantly less than the amounts identified in the PBGC's notices of lien. Moreover, the Debtors believe the PBGC liens are subordinate to the liens securing the debt in excess of $21 million owed to the Prepetition Secured Creditors. Accordingly, the Debtors submit that the value of the PBGC's liens, if valid, is nevertheless effectively zero.

3110409.2

a.    authorize the Debtors, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral in accordance with the budget attached to the proposed Emergency Order and such additional budgets as may be agreed to from time to time by the Debtors and KeyBank or approved by the Court (collectively, the "Budget");

b.    authorize the Debtors, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide adequate protection to the Prepetition Secured Creditors as set forth in the Emergency Order; and

c.    schedule additional hearings to consider entry of the Interim Order and the Final Order approving the Debtors' continued use of Cash Collateral.

### The Debtors Have an Immediate Need to Use Cash Collateral

31.    The Debtors have an urgent need to use Cash Collateral pending the interim and final hearings on this Motion. As of the Petition Date, the Debtors have very little or no unencumbered cash that can be used to fund their business operations and pay operating expenses. Absent the ability to use Cash Collateral, the Debtors will not be able to pay insurance, wages, utility charges, and other critical operating expenses.

32.    If the Debtors cannot obtain sufficient operating liquidity to meet their postpetition obligations on a timely basis they will be forced to discontinue operations resulting in a permanent and irreplaceable loss of business, and therefore value, to the detriment of the Debtors, their estates, creditors and other parties in interest. This potential loss of revenue and going concern value would be extremely harmful at this critical juncture and could jeopardize the Debtors' ability to maximize the value of their assets in these Chapter 11 Cases.

### The Proposed Adequate Protection

33.    In order to adequately protect the Prepetition Secured Creditors' interest in the Cash Collateral, the Debtors propose to provide the following forms of adequate protection (collectively, the "Adequate Protection").

14

3110409.2

34.   The Debtors propose to grant the Prepetition Secured Creditors, effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "Rollover Liens") on all Postpetition Collateral (as defined below) to the same extent and in accordance with the relative priority of their respective prepetition liens, subject only to the Carve-Out (as defined in the proposed Emergency Order).   The term "Postpetition Collateral" means all of the Debtors' assets (real and personal), including, without limitation, all of the Debtors' cash, accounts receivable, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, investment property, and books and records relating to any assets of the Debtors and all proceeds (including insurance proceeds) and products of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located, including a first lien on all recoveries of tax payments or refunds, recovered in the Debtors' Chapter 11 or 7 case, provided, however, that the Postpetition Collateral shall not, prior to entry of a final order, include claims of the Debtors, if any, pursuant to chapter 5 of the Bankruptcy Code ("Avoidance Claims"), any monies or other property recovered in connection with the successful prosecution or settlement of Avoidance Claims and refunds of worker's compensation insurance deposits.

35.   To the extent that the Rollover Liens are inadequate to protect the Prepetition Secured Creditors against any diminution in value of the Prepetition Collateral, the Debtors propose to grant the claims of the Prepetition Secured Creditors administrative priority pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, in accordance with the relative priority of their respective prepetition liens, but with priority over any and all other claims against the Debtors of any kind whatsoever, which priority shall not be affected in the event of a subsequent

appointment of a chapter 11 trustee or, to the extent provided by the Bankruptcy Code, the

conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

36.     The Debtors propose to provide the following additional forms of adequate

protection to KeyBank in recognition of its status as the first lien lender:

> a.  The Debtors propose to maintain their bank accounts at KeyBank and
>     grant to KeyBank a pledge of and lien on such accounts, including any
>     debtor in possession operating account and other accounts.
>
> b.  The Debtors propose to grant to KeyBank the right to credit bid the full
>     amount of its claim (pursuant to section 363(k) of the Bankruptcy Code,
>     section 1129(b)(2)(B) of the Bankruptcy Code, or otherwise in accordance
>     with applicable law), in whole or in part, in connection with any sale or
>     disposition of any assets of the Debtors, whether by an auction, under a
>     chapter 11 plan, or otherwise, without opposition from the Debtors.
>
> c.  The Debtors propose to deliver to KeyBank: (i) a weekly budget; (ii) a 13
>     week cash flow projection, updated weekly; (iii) a weekly cash Budget
>     analysis; (iv) monthly profit and loss statements; and (v) copies of
>     monthly operating reports prepared in accordance with the the Operating
>     Guidelines and Reporting Requirements for Debtors in Possession and
>     Trustees promulgated by the Office of the United States Trustee for
>     Region 2.

37.     The Prepetition Secured Creditors will be additionally protected as a result of the

continued operation of the Debtors' business operations.  Without the use of the Cash Collateral,

the Debtors would forego business opportunities and their operations would be irreparably

harmed.  Indeed, absent use of the Cash Collateral, the Debtors likely will be unable to pay their

ordinary business expenses, including employee wages.  Failure to make such payments would

significantly jeopardize the Debtors' ability to maintain their businesses and continue their

operations.  The Debtors believe that the going concern value of their businesses is significantly

greater than their liquidation value.  As such, the Debtors' continued operation likely presents the

best opportunity for the Prepetition Secured Creditors to receive the greatest recovery on account

of their claims.  Accordingly, the Debtors submit that use of the Cash Collateral will allow the

16

Debtors to continue their operations and, thereby, protect the Prepetition Secured Creditors' interests.

<u>Emergency Approval Should be Granted</u>

38. The Debtors' have formulated the Budget attached to the proposed Emergency Order for the use of Cash Collateral from the Petition Date through the week of March 16, 2018. The Debtors believe that the Budget includes only (i) such reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their businesses, and (ii) such administrative expenses to be incurred in connection with these Chapter 11 Cases that will become due and payable during the period covered by the Budget.

39. The Debtors respectfully request that the Court conduct an emergency preliminary hearing on this Motion and authorize the Debtors (from and after the entry of the Emergency Order and pending the hearings to consider entry of the Interim Order and Final Order) to use Cash Collateral in accordance with the Budget. Emergency access to the Cash Collateral will ensure that the Debtors are able to avoid immediate and irreparable harm pending the hearings to consider entry of the Interim Order and Final Order.

**C.    MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING (A) MAINTENANCE OF EXISTING BANK ACCOUNTS, (B) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND (C) CONTINUED USE OF EXISTING BUSINESS FORMS (the "<u>Cash Management Motion</u>")**

40. The Debtors seek entry of interim and final orders authorizing, but not directing them (a) to maintain their existing bank accounts, (b) to continue to use their existing cash management system and (c) to continue to use existing business forms.

***<u>The Debtors' Bank Accounts and Cash Management System</u>***

41. Prior to the Petition Date, the Debtors, in the ordinary course of their business, maintained several bank accounts (collectively, the "<u>Bank Accounts</u>"), which function as an

3110409.2

integrated cash management system (the "Cash Management System"). The Debtors' existing

Bank Accounts and their respective roles within the Cash Management System are as follows:

(a)    Operating Account. The Debtors maintain an operating account (account

No. XXXXXXXX9264, the "Operating Account") at KeyBank National

Association ("KeyBank"). The Debtors use the funds in the Operating

Account to fund their day to day operations and expenses, as well as

payroll and certain employee payroll deductions.

(b)    Workers' Compensation Claims Account. The Debtors maintain a

workers' compensation claims account (account No. XXXXXXXX2472,

the "WC Account") at KeyBank. All workers' compensation claims are

remitted to the WC Account by a third-party administrator.

(c)    Dental Claims Account. The Debtors maintain a dental claims account

(account No. XXXXXXXX2480), the "Dental Account") at KeyBank.

All dental claims are remitted to the Dental Account by a third-party

administrator.

42.    The Cash Management System enables the Debtors to monitor collection and

disbursement of funds and to facilitate the effective collection, disbursement, and movement of

cash.

43.    Without the relief requested in this Motion, the Debtors would be required to open

new, separate accounts as a debtor in possession, which would have the effect of disrupting their

existing Cash Management System. Not only would the Debtors be forced to devote valuable

time and resources to opening new accounts and implementing a new cash management system,

but critical funds may not be collected on account of accounts receivable. Moreover, the

opening of new accounts would certainly increase the Debtors' operating costs, thereby negatively impacting the Debtors' cash flow and would constitute an event of default under the loan agreement with KeyBank. Accordingly, the Court should authorize the Debtors' continued use of their existing Bank Accounts and Cash Management System.

44.     The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred. In addition, the Debtors will instruct their banks to add the designation "Debtor in Possession" or "DIP" to current and any future Bank Accounts with each such bank, and will treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession, and will maintain records that recognize the distinction between pre-petition and post-petition transfers.

45.     As of the Petition Date, the Debtors have instructed KeyBank to stop payment on all prepetition checks with the exception of checks relating to certain prepetition debts that the Debtor is seeking the authority to pay pursuant to several other motions filed contemporaneously herewith.

**D.      MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES AND BENEFITS, (II) AUTHORIZING THE CONTINUATION OF EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE OF BUSINESS AND (III) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION WAGE, SALARY AND BENEFIT OBLIGATIONS (the "<u>Wages and Employee Benefits Motion</u>")**

46.     The Debtors employ approximately 78 full-time employees and 1 part-time employee. Approximately 76% of all of the Debtors' employees are hourly wage earners, while the remaining 24% are salaried personnel. The hourly employees are members of the local chapter of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-

3110409.2

Industrial and Service Workers International Union (the "Union"). The salaried employees are not part of the Union.

47.    The Debtors also engage 4 independent contractors, 3 of which are sales personnel (the "Independent Contractors"). The sales personnel are paid on a commission basis, which averages approximately $10,000.00 per month. The Debtors are current with respect to their obligations owed to the Independent Contractors. As of the Petition Date, the accrued, unpaid commissions for the Independent Contractors totals approximately $2,000.00.

48.    Based upon historical data, the average weekly payroll for the hourly employees is approximately $55,000.00, and the average bi-monthly payroll for the salaried personnel is $67,000.00. The hourly employees are paid weekly in arrears, and the salaried personnel are paid on the 1st and the 15th of the month in arrears. The Debtors are current with respect to their payroll obligations. As of the Petition Date, the accrued, unpaid payroll for their employees is approximately $80,000.00, including the Debtors' portion of payroll taxes and employee benefits.

49.    Pursuant to this Motion, the Debtors seek to pay, in the ordinary course of business, the outstanding amounts owed as of the Petition Date for accrued and unpaid wages, commissions and salaries, including amounts that the Debtors are required by law to withhold from payroll checks with respect to federal, state and local income taxes, wage garnishments, social security and Medicare taxes.

50.    None of the Debtors' employees are currently, or anticipated to be, owed amounts that are at or over the $12,850.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

3110409.2

51.     The Debtors offer their employees other forms of compensation, including vacation pay, paid holidays, paid sick time and other earned time off, and reimbursement of certain business expenses.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

52.     <u>Vacation Time and PTO</u>.  The Debtors provide their employees with vacation and paid time off for holidays and certain leaves of absence, such as funeral leave (collectively, "<u>PTO</u>").  All employees are eligible to accrue PTO based upon each employee's years of service with the Debtors.  For Union employees, PTO accrues from July 1st to June 30th of the previous year, and for non-Union employees, PTO accrues from April 1st to March 31st of the current year.  PTO must be used each year and is not eligible to be paid out or carried forward to the next year.

53.     PTO that has accrued but remains unpaid as of the Petition Date totals approximately $247,767.00.  By the Wages and Employee Benefits Motion, the Debtors seek authority, but not direction, to honor in the ordinary course of business, the liabilities that arose under their PTO policies or practices prior to the Petition Date.  The Debtors anticipate that their employees will utilize any accrued PTO in the ordinary course without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

54.     <u>Expense Reimbursement</u>.  Employees are entitled to reimbursement of certain limited categories of expenses incurred in the ordinary course of business.  The Debtors routinely reimburse employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, transportation, meals, supplies and miscellaneous business expenses (collectively, the "<u>Business Expenses</u>").  Most Business Expenses are reimbursed directly to the employees within one to two weeks

21

following the date the expenses are incurred in paycheck supplemental payments or expense report submissions.

55.    Employees submit receipts for reimbursement which are processed through the normal expense report and accounts payable process. During a typical week, reimbursement for Business Expenses totals approximately $2,000.00. To the Debtors' knowledge, $3,000.00 is currently owed to employees for Business Expenses previously incurred; however, it is difficult for the Debtors to confirm if any other Business Expenses remain outstanding as of the Petition Date because employees may not have submitted expense reports as of the Petition Date.

56.    It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. The Debtors therefore seek authority to pay all prepetition Business Expenses in the ordinary course of business.

57.    Medical Plans. The Debtors provide primary health care coverage for all full-time and part-time employees and their eligible dependents through Excellus BlueCross BlueShield (the "Medical Plan"). In general, all employees are eligible for the benefits described herein immediately upon being hired or within 90 calendar days from the date of hire, unless otherwise agreed or negotiated with an employee.

58.    The Debtors pay a portion of the premiums due for each employee. In general, the Debtors pay between 75% and 100% of the premiums due on behalf of each employee. The balance of the premiums, if any, is funded through contributions by participating employees, through payroll deduction. Payment and funding of the Medical Plan is handled under varying arrangements, as appropriate. The Debtors pay approximately $907,235.63 per year or $17,446.84 per week for employees and their dependents for medical and coverage costs.

3110409.2

59.     The Debtors believe that the employee contribution portion of the premium, to the extent it remains in the Debtors' possession, constitutes monies held in trust and, therefore, is not property of the Debtors' bankruptcy estates.  Out of an abundance of caution, the Debtors seek authority to pay employee funds, which have been withheld to pay Medical Plan premiums, and to continue the practice of withholding funds from employees to pay for coverage under the Medical Plan, in the ordinary course of business.  In addition, by the Wages and Employee Benefits Motion, the Debtors seek authority to continue to make any such payments, claims and remittances related to the Medical Plan in the ordinary course of business.

60.     Dental Plan.  In addition to the Medical Plan, the Debtors also offer their full-time and part-time employees dental benefits through POMCO (the "Dental Plan").  The Debtors pay a portion of the premiums due for each employee.  In general, the Debtors pay between 75% and 100% of the premiums due on behalf of each employee.  The balance of the premiums, if any, is funded through contributions by participating employees, through payroll deduction.  The Debtors pay approximately $26,021.71 per year or $500.42 per week for employees and their dependents for dental and coverage costs.

61.     The Debtors believe that the employee payroll contributions are funds held in trust, and are not property of the Debtors' bankruptcy estates.  By the Wages and Employee Benefits Motion, the Debtors seek authority to continue to make any such payments, claims and remittances related to the Dental Plan in the ordinary course of business.

62.     Life Insurance.  The Debtors offer basic term life insurance with accidental death and dismemberment to their employees pursuant to policies provided by Mutual of Omaha (the "Life Insurance Plan").  Under the Life Insurance Plan, employees are eligible for coverages based upon their earnings.  The Debtors pay 100% of the premiums totaling approximately

23

$19,643.27 per year or $377.76 per week under the Life Insurance Plan. By the Wages and Employee Benefits Motion, the Debtors seek authority to continue to make any such payments, claims and remittances related to the Life Insurance Plan in the ordinary course of business.

63.    Disability Insurance.    The Debtors offer short-term and long-term disability coverage ("Disability Coverage") to their employees. Disability Coverage is provided through Guardian and 100% of the premiums are covered by the Debtors. The Debtors pay approximately $16,448.00 per year or $316.31 per week in premiums. The Debtors seek authority to continue to make any such payments, claims and remittances related to the Disability Coverage in the ordinary course of business.

64.    401(k) Retirement Savings Plan.    The Debtors offer certain employees the opportunity to participate in a retirement savings plan qualified under section 401(k) of title 26 of the United States Code (the "401(k) Plan"). The 401(k) Plan is administered by Massachusetts Mutual Life Insurance Company. Under the terms of the 401(k) Plan, eligible employees may elect to contribute a portion of their salary or wages to the 401(k) Plan via automatic, pre-tax salary deductions. The Debtors have historically made (i) a discretionary matching contribution in the amount of 27% to 50% for the first 5% of pay and (ii) contributions in the amount of 3% of an employee's gross salary to the 401(k) Plan for the benefit of their participating employees. Such contributions total approximately $188,000.00 annually or $3,615.38 per week.

65.    Workers' Compensation.    The Debtors provide workers' compensation benefits to all employees. These benefits are covered primarily under the Debtors' workers' compensation insurance programs, which are insured and administered by AmTrust North America. The Debtors' workers' compensation insurance policy was renewed as of December 27, 2017 and

3110409.2

coverage runs through December 27, 2018. The annual insurance premium is approximately $222,369.00. The Debtors make weekly payments towards the insurance premium based on a percentage of gross pay in the average weekly amount of $4,276.33. The workers' compensation insurance will renew on December 27, 2019 for a similar annual amount.

66.     There are no workers' compensation claims currently pending against the Debtors. However, the Debtors were previously self-insured. At the time the Debtors transitioned from self-insured to fully-insured, the New York State Workers' Compensation Board (the "WC Board") required that the Debtors deposit in excess of $2,000,000.00 (the "WC Deposit") with the WC Board to cover any open claims during the period that the Debtors were self-insured. The WC Deposit is more than sufficient to cover all such claims.

67.     Failure to maintain the workers' compensation insurance could result in the institution of administrative or legal proceedings against the Debtors and their officers and directors. Accordingly, the Debtors seek authority to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any required payments to the insurer, as they become due in the ordinary course of the Debtors' businesses.

68.     Social Security, Income Taxes, and Other Withholding. The Debtors routinely withhold from employee paychecks amounts that they are required to transmit to third parties. Examples of such withholding include social security, FICA, federal, state and local income taxes, garnishments, health care payments and charitable donations. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estate. Thus, the Debtors

3110409.2

believe that their practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtors seek authority to continue such practice.

69.     Finally, the Debtors seek an Order authorizing all banks to receive, process, honor and pay any and all checks drawn on the Debtors' payroll and general operating accounts related to Prepetition Wages and Benefits, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**E.     MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) HONOR PREPETITION INSURANCE PREMIUM FINANCING AGREEMENT AND (B) ENTER INTO NEW PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS (the "Insurance Premium Financing Motion")**

70.     The Debtors seek authority, but not direction, to (a) honor their prepetition insurance premium financing agreements and (b) enter into new premium finance agreements in the ordinary course of business.

71.     In the ordinary course of the Debtors' businesses, the Debtors maintain numerous insurance policies providing coverage for, among other things, property, general liability, crime and workers compensation as well as umbrella coverage (collectively, the "Insurance Policies"). The Insurance Policies are essential to the preservation of the Debtors' businesses, properties and assets and, in many cases, such coverages are required by various regulations, laws and contracts that govern the Debtors' commercial activity.

72.     The aggregate cost of the annual premiums for the Debtors' Insurance Policies is approximately $363,917.28.  It is not always economically advantageous for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' businesses, the Debtors finance the premiums on some of their Insurance Policies by entering into premium finance agreements with premium finance companies.

26

73.     Currently, the Debtors only finance their property insurance, pursuant to a premium financing agreement (the "Agreement") with IPFS of New York, LLC ("IPFS"). Prior to the Petition Date, the Debtors made a cash down payment to IPFS in the amount of $22,480.20 and financed the remaining $89,920.80 of premiums. In exchange for the financing, the Debtors agreed to pay nine monthly installment payments including a total finance charge of $1,577.16, representing an annual interest rate of 4.19%. In addition, the Debtors granted IPFS a security interest in return premiums and certain loss payments to secure its payment obligations.

74.     If the Debtors are not able to pay their financing obligations, IPFS may seek relief from the automatic stay to terminate the property insurance policy in order to recoup its losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtors' estates. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Debtors currently pay. Even if IPFS was not permitted to terminate the property insurance policy, any interruption of payment would have a severe, adverse effect on the Debtors' ability to obtain a new policy or finance premiums in the future.

75.     In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtors' cash flow and estates by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to honor their financing obligations. Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' reorganization efforts.

76.     In addition, because the Agreement and the Insurance Policies may expire during the course of these Chapter 11 Cases, the Debtors seek authority to renew the Agreement and

27

3110409.2

enter into other similar agreements for their Insurance Policies in the ordinary course of their businesses, without further Court approval. The Debtors will need to continue their insurance coverage throughout the entire duration of these Chapter 11 Cases. The Debtors respectfully submit that renewal of the Agreement falls squarely within the ordinary course of their businesses, and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Agreement. To reduce the administrative burden, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Agreement or enter into new insurance financing agreements for their Insurance Policies, if and when necessary.

**F.     MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO ENTER INTO TRADE AGREEMENTS WITH CRITICAL VENDORS AND TO PAY CERTAIN PREPETITION OBLIGATIONS IN CONNECTION THEREWITH (the "Critical Vendor Motion")**

77.    The Debtors seek authority to enter into trade agreements and to pay prepetition amounts owed to certain "critical vendors," which, in the Debtors' reasonable judgment, are necessary to prevent the disruption of the Debtors' operations.

78.    The Critical Vendors primarily consist of: (a) essential service providers; and (b) essential suppliers of various materials necessary to run the Debtors' facilities. The goods and services provided by these Critical Vendors are crucial to the Debtors' continuation of their businesses and would be difficult and expensive to replace. Payment of the claims of Critical Vendors (the "Critical Vendor Claims"), prior to the confirmation of a plan in these Chapter 11 Cases, is vital because: (a) the goods and services provided by the Critical Vendors are often the only source from which the Debtors can procure such goods and services; (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtors, result in the Critical Vendor refusing to provide goods and/or services to the Debtors; (c) the Critical Vendors provide

28

goods and services to the Debtors on advantageous terms; and/or (d) the Critical Vendors would themselves be irreparably damaged by the Debtors' failure to pay their prepetition claims, resulting in the Debtors being forced to obtain goods or services elsewhere that would either be at a higher price or not of the quantity or quality required by the Debtors. Furthermore, several of the Critical Vendors provide services without which the Debtors' facility cannot operate, which services the Debtors are unable to perform themselves and which would require an unduly burdensome amount of time and expense to obtain from another source.

79.     Specialized Raw Material and Parts Suppliers and Service Vendors. Many of the critical vendors provide materials and services that are essential for completion of the Debtors products (the "Material and Service Vendors"). In some cases, it is theoretically possible for the applicable materials to be substituted with materials provided by a different vendor, however, the methodical and carefully engineered process involved in crafting the Debtors' products is highly dependent on obtaining consistent raw materials, which prevents the Debtors from being able to switch materials from one vendor to another without causing substantial time delays associated with modifying the Debtors' processes to accommodate the substituted materials. As of the Petition Date, the Debtors estimate that they owe the Material and Service Vendors approximately $1,693,159.00 related to materials and services provided to the Debtors prepetition.

80.     503(b)(9) Claimants. A portion of the Critical Vendors' prepetition claims may also serve as payment with respect to goods delivered to the Debtors within the 20 days immediately preceding the Petition Date. Pursuant to section 503(b)(9) of the Bankruptcy Code, creditors have an administrative priority claim to the extent of "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which

29

the goods have been sold in the ordinary course of such debtor's business." Therefore, those Critical Vendors that have delivered goods to the Debtors in the ordinary course of business during the 20-day period prior to the Petition Date have claims that are entitled to administrative expense priority. The Debtors estimate that they owe approximately $570,487.00 to Critical Vendors for goods that were delivered to the Debtors within 20 days of the Petition Date. Authorizing the Debtors to pay a portion of these claims now instead of at the conclusion of these Chapter 11 Cases will assist the Debtors in negotiating with the vendors and will thereby increase the likelihood that such vendors will continue to supply the goods and services necessary to operate the Debtors' businesses on favorable pricing and credit terms.

81.    The Debtors seek authority to pay up to $507,948.00 in Critical Vendor Claims (the "Critical Vendor Cap"). Although the Debtors reserve the right to seek Court authority at a later date to increase the Critical Vendor Cap, the Debtors believe that payment of the amount specified herein would allow them to obtain those goods and services that are absolutely necessary to the Debtors' postpetition operations.[8]

82.    The Debtors have critically examined whether the payments of the Critical Vendor Claims described herein are necessary. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors and service providers to identify those vendors and providers who are essential to the Debtors' operations. The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors and service providers receiving

---

[8]  A portion of the Critical Vendor Claims which the Debtors seek authority to pay may relate to goods or services which were provided prepetition, but for which the Debtors have not yet been invoiced. To the extent that the Debtors have not been invoiced for prepetition Critical Vendor Claims, the Debtors seek authority to pay such Critical Vendor Claims only as such amounts become due in the ordinary course of business and in accordance with the Debtors' ordinary course payment practices.

3110409.2

payment for Critical Vendor Claims will continue to supply goods and services necessary to the Debtors' business on a postpetition basis.

83.    In determining the amount of Critical Vendor Claims to pay pursuant to this Motion, the Debtors consulted with the Debtors' management to identify those creditors that are most essential to the Debtors' operations, using criteria developed by the Debtors. These criteria included: (a) whether the vendor in question was a "sole-source" vendor; (b) whether preferences or requirements of the Debtors' customers prevent the Debtors from looking to alternative sources for a vendor's products or services; (c) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing such vendor postpetition would result in significantly higher costs to the Debtors; and (d) whether a vendor meeting the standards of (a), (b) or (c) above might additionally be forced to cease business operations (due to such vendor's own liquidity constraints) in the event its prepetition claim against the Debtors was not paid within a short time after the Petition Date.

84.    After evaluating the information received in response to these inquiries, the Debtors estimated the payment amount necessary to ensure the continued supply of critical goods and services, taking into account: (a) whether failure to pay a Critical Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtors; and (b) what percentage of the Critical Vendor's claims would need to be paid to induce it to continue providing goods and/or services to the Debtors. The Critical Vendor Cap represents this estimated amount.

85.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendors to continue supplying goods or services, as applicable (including, but not limited to, credit limits, pricing, cash discounts, timing of

31

payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) to the Debtors on terms that are consistent with the historical trade terms between the parties (the "Customary Trade Terms"). The Debtors reserve the right to negotiate trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary that from the Customary Trade Terms to the extent the Debtors determine that such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

86.    To ensure that the Critical Vendors continue to deal with the Debtors on Customary Trade Terms, the Debtors propose that the Debtors and the Critical Vendors enter into Trade Agreements. The Debtors seek authority to enter into the Trade Agreements, if and at the time when the Debtors determine in their discretion that such an agreement is necessary to their postpetition operations. The Debtors also explicitly seek authority, following diligent efforts to enter into a Trade Agreement with a Critical Vendor, to make payments on account of such Critical Vendor's claims in the event that no Trade Agreement has been reached, if the Debtors determine, in their business judgment, that failure to pay the Critical Vendor Claim is likely to result in irreparable harm to the Debtors' business operations.

87.    For those Critical Vendors who have agreed to continue on trade terms other than their Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case-by-case basis. Nothing in this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoices of a Critical Vendor under applicable non-bankruptcy law.

88.    If any Critical Vendor accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on

3110409.2

customary trade terms, any payments made will be deemed an avoidable postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request. Upon recovery by the Debtors, the claim will be reinstated as a prepetition claim in the amount so recovered.

89.     The Debtors will maintain a record of: (a) the name of each Critical Vendor paid on account of prepetition Critical Vendor Claims, (b) the amount paid to each Critical Vendor, and (c) the goods or services provided by such Critical Vendor.

90.     The Critical Vendor payments owed to Critical Vendors are key to the preservation of the Debtors' business (and its value) pending a sale of the Debtors, a sale of their assets, or the confirmation of a plan in these Chapter 11 Cases. If this Motion is not granted, it is likely that Critical Vendors will stop providing supplies and services to the Debtors on Customary Trade Terms, effectively reducing the amount of credit available to the Debtors. Moreover, certain of the Critical Vendors could stop doing business with the Debtors altogether, leaving the Debtors unable to obtain the essential materials and services for their business, forcing the Debtors to incur higher costs to obtain replacement materials and services, and, in any event, causing such substantial delays in the Debtors' operations that the Debtors may never fully recover from the harm resulting from such a delay. As further detailed below, such actions would be extremely damaging, if not devastating, to the Debtors, their estates and their creditors.

91.     In particular, continued availability of materials and services in amounts and on terms consistent with those the Debtors enjoyed prepetition is vital to the Debtors' business because it allows the Debtors to maintain operations as a going concern pending the confirmation of a plan in these Chapter 11 Cases. Preserving the Debtors' ability to operate will enable the Debtors to maintain their competitiveness and to maximize the value of their business.

3110409.2

Conversely, a disruption or cancellation of deliveries of goods or provision of services – which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition, and ultimately impede the Debtors' ability to service their customers and generate revenue, thereby placing the value of their business at risk.

**G.  MOTION FOR INTERIM AND FINAL ORDERS (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES TO AND/OR DISCRIMINATING AGAINST THE DEBTORS ON ACCOUNT OF PREPETITION AMOUNTS DUE, (B) DETERMINING THAT THE DEBTORS' UTILITIES ARE ADEQUATELY ASSURED OF FUTURE PAYMENT, (C) AUTHORIZING THE DEBTORS TO PAY ADEQUATE ASSURANCE DEPOSITS AND (D) ESTABLISHING PROCEDURES FOR OBJECTING OR REQUESTING ADDITIONAL ASSURANCE OF PAYMENT (the "Utilities Motion")**

92.    The Debtors seek entry of interim and final orders (a) prohibiting utility companies from altering, refusing or discontinuing services to and/or discriminating against the Debtors on account of prepetition amounts due, (b) determining that the Debtors' utility companies are adequately assured of future payment, (c) authorizing the Debtors to make adequate assurance deposits and (d) establishing procedures for determining requests for additional assurance of payment.

93.    The Debtors currently use water, electricity, natural gas, telecommunications, and other similar services provided by the Utility Companies. Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful restructuring. The Debtors could not maintain their facilities or continue to operate their business in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors.

3110409.2

94.     The Debtors intend to timely pay its postpetition obligations to the Utility Companies. The Debtors will make these payments with cash generated during this Chapter 11 Case and pursuant to orders of this Court authorizing the use of cash collateral.

95.     Although the Debtor maintains that its ability to generate cash from operations during this Chapter 11 Case should be sufficient assurance of postpetition payments to Utility Companies, the Debtor proposes to provide a deposit equal to two weeks of utility service, calculated as a historical average over the past twelve (12) months (the "Adequate Assurance Deposit"), to any Utility Company who requests such a deposit in accordance with the provisions of the proposed interim order, provided that such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit, and provided further that such Utility Company is not currently paid in advance for its services.

96.     The Debtors believe that most, if not all, of their Utility Companies have adequate assurance of payment even without the Adequate Assurance Deposit.  When the Adequate Assurance Deposit is complemented by the Debtors' ability to pay through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is thus clearly "adequate."

97.     Moreover, if a Utility Company disagrees with the Debtors' analysis, the Utility Company may file an Objection and negotiate a resolution thereof with the Debtors and, if necessary, seek Court intervention without jeopardizing the Debtors' continuing operations.

98.     Receiving the relief requested in the Utilities Motion is essential for the Debtors to be able to carry out its reorganization efforts.  If the Utilities Motion is not granted, the Debtors could be forced to address numerous requests by its Utility Companies in a disorganized

35

3110409.2

manner at a critical point in these Chapter 11 Cases. Moreover, the Debtors could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, that it is not adequately protected and therefore that it will discontinue service or make an exorbitant demand for payment to continue service. Discontinuation of utility service, particularly water, gas, electricity and telecommunications, could essentially shut down the Debtors' operations, jeopardizing the Debtors' reorganization efforts. Based on the foregoing, the Debtors submit that granting the relief requested herein is both necessary and appropriate.

## H.   MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO PAY PREPETITION TAXES AND REGULATORY FEES (the "Tax Motion")

99.    The Debtors seek authority to pay, in the ordinary course of the Debtors' business, prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "Taxes"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees", and together with the Taxes and Regulatory Fees, the "Taxes and Fees") to the respective federal, state and local taxing authorities and other governmental agencies (each a "Taxing Authority" and collectively, the "Taxing Authorities").

100.    In the ordinary course of their business, the Debtors are required to collect and/or pay Taxes and Fees. The Debtors must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtors conduct business. The process by which the Debtors remit the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

101.    As of the Petition Date, the Debtors believe that they are generally current with

36

respect to the payment of Taxes except that (i) certain sales and use taxes may be owed to New York State with respect to non-manufacturing goods purchased by the Debtors for which the vendor did not collect the applicable tax and (ii) certain Taxes may have accrued prepetition but not yet come due for payment.[9]

102.    The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, certain Taxing Authorities were sent checks or electronic transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions as of the Petition Date.

103.    The Debtors further request that all applicable banks and financial institutions be authorized and directed, when requested by the Debtors in their sole discretion, to receive, process, honor and pay any and all checks or electronic transfers drawn on the Debtors' accounts to pay all prepetition Taxes and Fees owed to the Taxing Authorities, whether those checks were presented prior to or after the Petition Date and to make other transfers provided that sufficient funds are available in the applicable accounts to make such payments. To the extent the Taxing Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Debtors seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary, to pay all outstanding Taxes and Fees owing for periods prior to the Petition Date.

---

[9] The Debtors are not current on their real property tax obligations; however, by this Motion, the Debtors are not seeking authorization to pay real property taxes, other than real property taxes that relate to periods which straddle the petition date or which are first payable without penalty after the Petition Date.

3110409.2

I.   **MOTION FOR ENTRY OF AN ORDER EXTENDING THE TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF CURRENT INCOME AND EXPENDITURES, SCHEDULES OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND STATEMENTS OF FINANCIAL AFFAIRS (the "Schedules Extension Motion")**

104.   The Debtors seek entry of an order extending the time for the Debtors to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") to the date which is forty-five (45) days following the Petition Date.

105.   The Debtors estimate that they have more than 200 creditors and other parties in interest.  Given the size and complexity of the Debtors' business operations, preparing the Schedules and Statements accurately and with sufficient detail will require significant attention from the Debtors' personnel and advisors.  The complexity of the Debtors' businesses, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, the pressure incident to the commencement of these Chapter 11 Cases, and the fact that certain prepetition invoices may have not yet been received or entered into the Debtors' accounting system provide ample cause justifying, if not necessitating, the requested extension of the deadline to file the Schedules and Statements.

106.   In addition, the Debtors submit that focusing the attention of key personnel on critical, strategic operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest.  Consequently, it is in the best interests of the Debtors and their

38

creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Debtors with a total of 45 days from the Petition Date to file the Schedules and Statements.

*[signature page follows]*

3110409.2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on February 28, 2018

DONALD SCHNACKEL

3110409.2